IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| AISHA NAKABUGO,<br><br>*Plaintiff*,<br><br>v.<br><br>UR M. JADDOU, in her official capacity as Director of United States Citizenship and Immigration Services; and<br><br>RENA BITTER, in her official capacity as Assistant Secretary of State for Consular Affairs; and<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security.<br><br>*Defendants.* | **Case No.** |

# COMPLAINT

## INTRODUCTION

1. Plaintiff Aisha Nakabugo is an asylee from Uganda who came to the United States nearly seven years ago to escape a forced marriage, marital rape, domestic violence, and verbal and physical abuse from her then-husband, as well as threats and abuse from certain family members based on her sexual orientation. After receiving asylum, she filed petitions

requesting permission for her two minor children—her daughter, C.T., and her son, A.W.[1]—to be reunited with her in the United States. At each stage of the administrative process since then, Defendants have unreasonably delayed action on Ms. Nakabugo's petitions.

2. The United States Citizenship and Immigration Services ("USCIS") received Ms. Nakabugo's petitions on October 30, 2019. *See* Exs. 1, 2. On July 12, 2021—over a year and a half later—USCIS initially approved the petitions, and sent them to the U.S. Embassy in Kampala, Uganda (the "Kampala Embassy" or the "Embassy") for processing. *See* Exs. 1, 2.

3. On July 21, 2022—after another year—C.T. and A.W. visited the Kampala Embassy for their beneficiary interviews.

4. Following the interviews, the Kampala Embassy requested additional information and required Ms. Nakabugo, A.W., and Ms. Nakabugo's ex-husband—who is also her primary persecutor—to submit to DNA testing. Ms. Nakabugo promptly provided all information when requested. As of the filing of this Complaint—nearly two years after the beneficiary interviews—the Kampala Embassy has provided no further information regarding the processing of Ms. Nakabugo's petitions.

5. All in all, it has been more than four and a half years since Ms. Nakabugo filed her family reunification petitions for her children. At every turn, Ms. Nakabugo's best efforts to be reunited with her children have proved fruitless in the face of Defendants' unacceptable and unexplained delays in carrying out their nondiscretionary statutory duties.

6. Ms. Nakabugo now seeks an order from this Court pursuant to the Administrative Procedure Act ("APA") and the Mandamus Act to compel Defendants to—finally—promptly and properly adjudicate her petitions.

---

[1] In accordance with Fed. R. Civ. P. 5.2(a), this Complaint refers to the minor children using only initials.

**PARTIES**

7. Plaintiff Aisha Nakabugo is a lawful permanent resident of the United States residing in the State of Massachusetts, originally from Uganda. Ms. Nakabugo was granted asylum in February 2018 and filed family reunification petitions for her minor children, C.T. and A.W., in October 2019. She is still waiting for a final decision.

8. Defendant Ur M. Jaddou ("Jaddou") is sued in her official capacity as Director of USCIS, a component agency of the Department of Homeland Security. Defendant Jaddou directly oversees USCIS's operations, which includes the processing and adjudication of Ms. Nakabugo's family reunification petitions.

9. Defendant Rena Bitter ("Bitter") is sued in her official capacity as Assistant Secretary of State for Consular Affairs, a component agency of the U.S. Department of State. Defendant Bitter directly oversees all U.S. embassies, including the U.S. Embassy in Kampala, Uganda, which is responsible for certain stages of the processing and adjudication of Ms. Nakabugo's family reunification petitions.

10. Defendant Alejandro Mayorkas ("Mayorkas") is sued in his official capacity as Secretary of Homeland Security. Defendant Mayorkas directly oversees the Department of Homeland Security's operations and those of its component agencies, such as USCIS and U.S. Customs and Border Protection ("CBP"), including the processing of asylee family reunification petitions and admission of beneficiaries of approved petitions to the United States.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction pursuant to Federal Question, 28 U.S.C. § 1331 and the Mandamus Act, 28 U.S.C. § 1361. This Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

12. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e)(1)(C). Each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity. No real property is involved in this action, and Plaintiff Nakabugo resides in the District of Massachusetts.

## FACTUAL BACKGROUND

### The Follow-to-Join Program

13. Individuals who are granted asylum in the United States are eligible to have their spouses and unmarried children join them through a process called "follow-to-join" ("FTJ"). *See* 8 U.S.C. § 1158(b)(3)(A) ("A spouse or child . . . of an alien who is granted asylum . . . may . . . be granted the same status as the alien if accompanying, or following to join, such alien."). To establish eligibility for the FTJ process, the asylee need not establish that her spouse or unmarried child has an independent claim to persecution.

14. The FTJ statute reflects Congress' considered judgment that family reunification is an important goal of U.S. immigration law.

### The Follow-to-Join Application Process

15. The FTJ application process consists of two stages: domestic and international processing.

16. *First*, in the domestic processing stage, the asylee in the United States submits a separate Form I-730 ("Refugee/Asylee Relative Petition") to USCIS for each eligible family member. The asylee-petitioner must demonstrate that (1) she is an asylee or has adjusted from asylee status to become a lawful permanent resident, (2) the proposed beneficiary is an eligible spouse or unmarried child, and (3) the petition was filed within two years of the date the asylee-petitioner was granted asylum. *See* 8 C.F.R. § 208.21(d), (f).

17. If USCIS determines that the petition is complete and timely, and that the petitioner and beneficiary appear to be eligible for this immigration benefit, USCIS may approve the FTJ petition pending an admissibility determination of the petition's beneficiary.

18. USCIS then sends the approved petition to the National Visa Center ("NVC"), a branch of the State Department, for the second stage of processing.

19. <u>Second</u>, in the international processing stage, NVC forwards the petition overseas for further processing.

20. The petition is either forwarded to a USCIS International Office or a U.S. Embassy (together, "overseas post"), depending on the geographic location of the petition's beneficiary.

21. During this stage, the overseas post confirms that the beneficiary of the approved petition is eligible to "follow to join" his or her spouse or parent and be admitted to the United States as an asylee.

22. To facilitate determinations, the overseas post conducts an interview of the beneficiary.

23. The beneficiary's biometric fingerprints may be collected at the interview.

24. Before final approval, a beneficiary must complete a medical examination and clear security vetting and background checks.

25. With limited exceptions, a medical exam is valid for no more than six months from the examination date and must be repeated if it expires before entry to the United States.

26. After a beneficiary receives final approval, the U.S. Embassy will issue a "Travel Packet" and a Boarding Foil, valid for 180 days, for the beneficiary's passport.

27. Until the beneficiary is admitted into the United States, the government agencies involved in processing the FTJ petition may revoke a prior approval and/or return the petition to previous processing steps.

28. USCIS is responsible for final adjudication of FTJ petitions pursuant to 8 U.S.C. § 1157(c). An approved FTJ petition is valid indefinitely so long as the qualifying relationship between the petitioner and beneficiary continues to exist and the petitioner's status has not been revoked.  8 C.F.R. § 208.21(d).

### Ms. Nakabugo's Follow-to-Join Petitions

29. Ms. Nakabugo is a lawful permanent resident of the United States originally from Uganda. She was driven to flee Uganda due to her forced marriage to her former husband and his marital rape, violent abuse, and discovery of her sexual orientation, as well as threats from members of her own family to expose her homosexuality to government and tribal officials. If exposed as a lesbian in Uganda, she would be at serious risk of arrest, imprisonment, violence, and even death.

30. Ms. Nakabugo applied for asylum in the United States, which was granted in February 2018. Ms. Nakabugo subsequently applied for and received her green card and lawful permanent resident ("LPR") status in 2022.

31. In October 2019, Ms. Nakabugo filed FTJ petitions for her two minor children, C.T. and A.W. At the time Ms. Nakabugo filed her FTJ petitions, C.T. was approximately eight years old and A.W. was approximately three years old.

32. Defendants took more than a year and a half to complete the first stage of processing for Ms. Nakabugo's petitions; she was not issued notices of approval until July 12,

2021.  On January 1, 2022—nearly half a year later—NVC notified Ms. Nakabugo that they would be forwarding the approved applications to the Kampala Embassy for processing.

33. On July 5, 2022, the Embassy informed Ms. Nakabugo that an interview had been scheduled for C.T. and A.W. on July 21, 2022.  The Embassy required Ms. Nakabugo to confirm the children's attendance by July 11, 2022.

34. Ms. Nakabugo confirmed the children's attendance and fulfilled other pre-interview requests made by the Embassy.

35. After much effort from Ms. Nakabugo, the children were able to attend their interview at the Kampala Embassy on July 21, 2022.

36. At the interview, the Embassy requested additional documentation reflecting Ms. Nakabugo's relationship with her daughter, C.T., and DNA testing to establish her relationship to her son, A.W.

37. In less than a month, Ms. Nakabugo took steps to provide all the information the Kampala Embassy requested.  By August 9, 2022, Ms. Nakabugo had completed all of the necessary steps within her control, including providing and arranging for delivery of documentation of her relationship to C.T. and collecting her own DNA sample and arranging for delivery of a sample collection kit to the Embassy.  Two months later, the Embassy scheduled A.W.'s DNA testing sample collection for October 26, 2022.

38. On November 16, 2022, Ms. Nakabugo received a letter from the Universal Genetics laboratory dated November 2, 2022, that confirmed the DNA match between Ms. Nakabugo and her son, A.W.  *See* Ex. 3.

39. Ms. Nakabugo, through her counsel, followed up with the Embassy on no less than seven occasions between December 2022 and August 2023.  Each time, Ms. Nakabugo

sought instructions on the next steps for processing the children for travel to the United States. Each time, Ms. Nakabugo received no response.

40. In September 2023—now over one year after the children's interview—Ms. Nakabugo learned that the Embassy was in contact with her former husband—the man that she had fled Uganda to escape. In Ms. Nakabugo's original FTJ petitions, her former husband submitted a sworn affidavit, dated February 4, 2019, attesting that he was the children's biological father and that he consented to the children traveling to the United States to visit or to stay with Ms. Nakabugo.

41. Ms. Nakabugo, through counsel, requested information as to why Defendants involved her persecutor, who is not a party to the petitions and had already provided his consent, particularly given that she had already proved—at the Embassy's request—that she was the children's biological mother. Ms. Nakabugo also sought assurances that the Embassy would protect the confidentiality of her case in their interactions with her former husband. By email, dated September 13, 2023, Embassy staff assured Ms. Nakabugo that they would respect her privacy. On information and belief, the Kampala Embassy has never informed Ms. Nakabugo why it was appropriate or necessary to receive further information from her persecutor.

42. On information and belief, the Embassy interviewed Ms. Nakabugo's former husband on September 14, 2023 and thereafter sought and completed DNA testing of Ms. Nakabugo's ex-husband to establish his paternal relationship to C.T. and A.W. When Ms. Nakabugo sought information from the Embassy about the basis for this request, she did not receive a response.

43. Following this, Ms. Nakabugo's counsel again contacted the Embassy on several occasions, seeking information on next steps. Ms. Nakabugo still has not received a response.

44. Ms. Nakabugo timely filed her FTJ petitions more than four and a half years ago, and has diligently and promptly done everything that has been asked of her at each stage of this long process. Yet, the Embassy has consistently failed to take timely action on Ms. Nakabugo's petitions.

45. As a result of Defendants' delay, Ms. Nakabugo has been separated from her children for approximately seven years, more than four and a half of which have passed since filing her petitions. Approximately three years have passed since USCIS initially approved the petitions. Ms. Nakabugo and her minor children have suffered and continue to suffer greatly due to Defendants' dilatory behavior, which has needlessly prolonged their separation.

**Ms. Nakabugo has Suffered Hardship from the Prolonged Separation from her Children**

46. Ms. Nakabugo fled persecution by her husband and family in Uganda and came to the United States in August 2017. She was granted asylum in February 2018.

47. Ms. Nakabugo has not seen her two children since 2017, when C.T. was approximately six years old and A.W. was still an infant, less than one year old. With every month that Defendants continue to delay their reunification, Ms. Nakabugo is deprived of the opportunity to watch her children—who are now approximately thirteen and seven—grow up.

48. Since arriving in the United States, Ms. Nakabugo has struggled to communicate with her children and receive updates about their wellbeing. Although she does her best to support them as much as possible—including by paying for C.T.'s boarding school—by sending money that she earns as a nursing assistant in the United States, she has learned that the children have exhibited signs of neglect over the years since she was forced to flee to the United States.

49. While Defendants take their time to act on Ms. Nakabugo's petitions, C.T. and A.W. are growing up without the love and support of their mother. Being separated from her

children has caused Ms. Nakabugo serious and continuing emotional anguish.  So long as they remain separated, Ms. Nakabugo is unable to ensure the safety and well-being of her two young children.

50. At every stage of the FTJ petition process, Defendants have unreasonably delayed in processing Ms. Nakabugo's family reunification petitions for C.T. and A.W.  Defendants also have left Ms. Nakabugo in the dark as to the reasons for the delay in processing the family reunification petitions for the two minors, despite the fact that Ms. Nakabugo has provided every single piece of follow-up information demanded of her.

51. Ms. Nakabugo's processing time—approximately 57 months, as of July 2024—is evidence of an extraordinary and unreasonable delay.  Defendants must be compelled to make a final determination on Ms. Nakabugo's family reunification petitions, which includes a determination of her children's admissibility to the United States.

## FIRST CAUSE OF ACTION

## Administrative Procedure Act

52. The foregoing allegations are repeated and incorporated as though fully set forth herein.

53. Pursuant to 8 U.S.C. § 1158(b)(3)(A) and the regulations governing FTJ petitions, 8 C.F.R. § 208.21, Defendants have a nondiscretionary duty to adjudicate Ms. Nakabugo's FTJ petitions.

54. The APA obligates Defendants to take these nondiscretionary actions within a "reasonable time," 5 U.S.C. § 555(b), and directs this Court to compel Defendants to take these actions when they are "unreasonably delayed[,]" *id.* § 706(1).

55.     Defendants have failed to adjudicate Ms. Nakabugo's FTJ petitions within a reasonable time, which caused and continues to cause irreparable harm to Ms. Nakabugo.

56.     Ms. Nakabugo is entitled to relief pursuant to 5 U.S.C. § 706(1), compelling Defendants to adjudicate her FTJ petitions.

## SECOND CAUSE OF ACTION

### Mandamus

57.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

58.     The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a nondiscretionary duty owed to Ms. Nakabugo.

59.     The All Writs Act, 28 U.S.C. § 1651(a), authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

60.     Pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(3)(A), and the regulations governing FTJ petitions, 8 C.F.R. § 208.21, Defendants have a nondiscretionary duty to adjudicate Ms. Nakabugo's FTJ petitions.

61.     Ms. Nakabugo has brought this action because she has no other means to compel Defendants to perform the nondiscretionary duty that Defendants owe to Ms. Nakabugo.

62.     Ms. Nakabugo is entitled to a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651, as well as this Court's inherent equitable authority, compelling Defendants to adjudicate her FTJ petitions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aisha Nakabugo respectfully requests that this Court:

1. Declare pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants' delay in the adjudication of Plaintiff's FTJ petitions is unreasonable under the APA, 5 U.S.C. § 706(1);

2. Issue an order that requires Defendants to promptly adjudicate Plaintiff's FTJ petitions;

3. Issue a writ of mandamus, pursuant to 28 U.S.C. §§ 1361 and 1651, directing Defendants to adjudicate Plaintiff's FTJ petitions;

4. Retain jurisdiction over this action and any attendant proceedings until Defendants have in fact finally adjudicated Plaintiff's FTJ applications and have communicated the results of such adjudications to Plaintiff and the Court;

5. Award Plaintiff's attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

6. Award such other and further relief that the Court may deem just and proper.

Dated: July 8, 2024

Respectfully submitted,

*/s/ Samuel Parker*
Samuel Parker (Bar #712101)
saparker@cov.com
Covington & Burling, LLP
One International Place
Suite 1020
Boston, MA 02110
Phone: 617-603-8820

*Attorneys for Plaintiff*